## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Colette C. C.,                                     Case No. 20-cv-2282 (NEB/TNL)

       Plaintiff,

v.                                                        **REPORT & RECOMMENDATION**

Kilolo Kijakazi,
Acting Commissioner of Social Security, [1]

       Defendant.

James H. Greeman, Greeman Toomey, 250 Marquette Avenue, Suite 1380, Minneapolis, MN 55401 (for Plaintiff); and

James D. Sides, Social Security Administration, Office of the General Counsel, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Colette C. C. brings the present case, contesting Defendant Commissioner of Social Security's denial of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*

This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 24, and the Commissioner's Motion for Summary Judgment, ECF No. 26. These motions have been referred to the undersigned for a report and recommendation to the district court, the

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

Honorable Nancy E. Brasel, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment, ECF No. 24, be **DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 26, be **GRANTED**.

## II. PROCEDURAL HISTORY

On December 14, 2018, Plaintiff applied for DIB asserting that she has been disabled since November 6, 2018, due to Parkinson's disease, brain stimulator surgery, and rheumatoid arthritis. Tr. 19, 21, 66. Plaintiff's application was denied initially on March 1, 2019, and again upon reconsideration on April 26, 2019. Tr. 19, 65-77, 80-93.

Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). Tr. 19. The ALJ held a telephone hearing in April 2020, and later issued an unfavorable decision. Tr. 16-36. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied. Tr. 1-6.

Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 24, 26. This matter is now fully briefed and ready for a determination on the papers.

## III. MEDICAL RECORDS

Plaintiff has a history of Parkinson's disease and rheumatoid arthritis. *See, e.g.,* Tr. 294-95, 347, 356, 364, 406. She was diagnosed with Parkinson's disease in 2007 and

developed a hand tremor after a car accident in 2006. Tr. 406. She also has a history of a freezing gait, dyskinesia, and trouble balancing during her "off-period" of medications. *Id*. According to her doctor, however, her symptoms were well-controlled with a medication regimen of Rytary, Sinemet, and Stalevo,[2] amantadine,[3] and Comtan.[4] *Id*.

## A. 2017

In 2017, Plaintiff was experiencing significant tremors which were affecting her daily activity and overall function level. Tr. 406. Plaintiff elected to be part of clinical research at the University of Minnesota Medical Center and undergo deep brain stimulator ("DBS") surgery.[5] *Id*. Plaintiff's "goals of surgery [were] to improve her quality of life." *Id*.

In October 2017, Plaintiff had a two-part left-side DBS surgery at the University of Minnesota Medical Center. Tr. 404. During the left-side "Phase I" surgery, doctors placed a DBS electrode on Plaintiff's left globus pallidus internus. *Id*. During the left-side "Phase II" surgery one week later, doctors placed a DBS generator/battery over Plaintiff's left chest wall and placed two extension wires. *Id*. Doctors connected one extension wire to

---

[2] Rytary, Sinemet, and Stalevo are brand names for a combination of levodopa and carbidopa, a medication used to treat the symptoms of Parkinson's disease such as tremors, shaking, stiffness, and slowness of movement. *Levodopa and Carbidopa*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601068 html (last accessed July 28, 2022).

[3] Amantadine is a medication used in combination with levodopa and carbidopa to treat difficulty moving, walking, and speaking in people with Parkinson's disease. *Amantadine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682064.html (last accessed July 28, 2022).

[4] Comtan is a brand name for entacapone, a medication used in combination with levodopa and carbidopa to treat end-of-dose "wearing-off" symptoms of Parkinson's disease. *Entacapone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601236 html (last accessed July 28, 2022).

[5] "Deep brain stimulation (DBS) is a treatment that involves an implanted device that delivers an electrical current directly to areas of [the] brain. That current improves how well those parts work. It's most often used for conditions like Parkinson's disease and epilepsy." *Deep Brain Stimulation*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/21088-deep-brain-stimulation (last accessed July 28, 2022).

the left-side DBS electrode placed during Plaintiff's first surgery. *Id*. The second extension was placed for the forthcoming right-side surgery.

Plaintiff tolerated both left-side surgeries well and had no complications. Tr. 406. Plaintiff did well after being discharged and reported enjoying her "honeymoon" period from the surgery, though she believed her symptoms were coming back again. *Id*.

In November 2017, Plaintiff had her right-side DBS surgery. Tr. 404-09. Phases I and II were combined, and doctors placed the DBS electrode on Plaintiff's right globus pallidus internus and connected it to the generator/battery placed during the second surgery. Tr. 404, 407-08. There were no complications and Plaintiff was discharged the next day. Tr. 412.

While at the hospital, Plaintiff spoke with an occupational therapist to discuss concerns about functional mobility and activities of daily living performance. Tr. 413. The occupational therapist noted that Plaintiff "demonstrates [the] ability to walk around her room and denies concerns about balance or [activities of daily living] independence." *Id*. The occupational therapist observed that Plaintiff's gait pattern was typical for a person with Parkinson's disease. *Id*. Plaintiff again reported being in a post-surgery "honeymoon phase" with improved mobility. *Id*. The occupational therapist recommended that Plaintiff complete outpatient physical therapy to optimize safety and independence with functional mobility, and Plaintiff stated she would attend if ordered by her doctor at her follow-up appointment. *Id*.

In December 2017, Plaintiff saw Anne Olson, MD, for a follow-up appointment. Tr. 363. Plaintiff reported that since being discharged from the hospital, she has been

feeling better, has already been noticing some improvement, and has no concerns. Tr. 363-64. Dr. Olson observed that Plaintiff had fairly normal gait and speech. Tr. 364. Plaintiff was directed to follow up as needed. Tr. 365.

Also in December 2017, Plaintiff saw Scott Cooper, MD, and Amber Stutz, MD, to have the DBS programmed. Tr. 396. Dr. Cooper and Dr. Stutz paired the programmer and instructed Plaintiff on how to adjust the current. *Id*. Plaintiff was directed to continue her medication regimen and return in early 2018. *Id*.

### B. 2018

#### 1. Medical Appointments

In February 2018, Plaintiff saw Dr. Cooper and Elliot Johnson, MD, for a follow-up appointment. Tr. 387. She reported that her walking is better, her balance has improved, and her tremors and dyskinesias are gone. *Id*. She reported that since surgery, however, her speech is softer and she speaks more quickly. *Id*. She also noticed that her handwriting has gotten smaller and sloppier. *Id*. Dr. Cooper observed that Plaintiff's left side of the body is relatively normal, but her right side has mild parkinsonism. Tr. 389. Dr. Cooper increased the left brain current to target the right side of the body, instructed Plaintiff to increase the left brain current again in two weeks, and referred Plaintiff to "Big and Loud" speech therapy. *Id*.

A week later, Plaintiff spoke with a nurse by phone. Tr. 386. The nurse informed Plaintiff that she could do Big and Loud therapy at the Forest Lake Allina clinic. *Id*. Plaintiff reported that the increased current setting "has led to a slight improvement in her symptoms." *Id*. She also reported that she has had virtually no dyskinesia. *Id*.

In March, Plaintiff saw Drs. Stutz and Cooper for another follow-up appointment. Tr. 380. Plaintiff reported many benefits from the DBS surgery, including better walking, no freezing, no spasms, no falls, no dyskinesias, improved tremor on the right hemi body, resolved tremor on the left hemi body, improved stiffness, and improved sleep. *Id*. Plaintiff, however, also reported worsening speech, specifically, that her speech is softer, she is stumbling over her words, and she sometimes slurs if she speaks too quickly. *Id*. She also reported worsening handwriting, which has become smaller and more illegible. *Id*. Dr. Stutz noted that Plaintiff has "demonstrated an excellent response to DBS stimulation," with a "perfect" tremor control on the left and only a slight tremor on the right. Tr. 383. Dr. Stutz directed Plaintiff to slowly increase the current every week to improve tremor control on the right side of the body. *Id*.

About a week after her appointment, Plaintiff reported that she was involved in a motor vehicle accident and that she was feeling some stiffness in her lower back and neck as a result. Tr. 379. Plaintiff was informed that she could wait to increase the current setting on her programmer until she feels better. *Id*. Plaintiff also reported that she was seeing a chiropractor to help with the stiffness. *Id*.

Later in March, Plaintiff reported that her husband unexpectedly passed away and that she would not be increasing the current setting on her programmer. *Id*.

In April, Plaintiff reported that she had not increased the setting on her programmer in the last few weeks given the added stress of her husband's passing. Tr. 378.

Plaintiff then missed her follow-up appointment in early May. Tr. 377. A few weeks later, Plaintiff informed her medical team that she regretfully needed to resign from

the DBS research study.  Tr. 376.  Plaintiff reported that she had a lot going on in her life since her husband passed away, including getting her house ready to sell, trying to find an apartment, and working full time.  Tr. 376-77.  She noted that she was "doing okay with the brain stimulator," and that she would schedule an appointment with Dr. Cooper once things slowed down for her.  Tr. 377.

In August, Plaintiff confirmed that she would like to remain withdrawn from the DBS research study.  Tr. 374.  She reported that she had not had the bothersome tremor. Tr. 375.  She also reported that she tried to increase the right side current, but it negatively affected her speech.  *Id*.

Over the next couple of months, Plaintiff exchanged emails with a nurse regarding her insurance coverage.  Tr. 372-74.  Plaintiff could not attend her scheduled appointment in September because insurance would not cover it.  Tr. 373.

In October, Plaintiff emailed the nurse that she had noticed a change in her speech the last two days.  Tr. 372.  Plaintiff reported that people at work said that they are having a hard time understanding what she is saying.  *Id*.  She reported that everything had been going fine with her speech since therapy.  *Id*.  She reported that her mouth seems to get dry a lot more, but she takes her medications on schedule and has not made changes to the levels on her stimulator.  *Id*.  She also reported that she has been under some stress personally and at work.  *Id*.

### 2. Occupational Therapy Appointments

In March 2018, Plaintiff began attending occupational therapy at the Courage Kenny Rehabilitation Institute.  Tr. 355.  During her first session, Plaintiff explained that

since her DBS surgeries in late 2017, she has had no difficulties with her left side but has had trouble with her right side.  Tr. 356.  She told the Occupational Therapist ("OT") that she also has had difficulty with right hand dexterity and handwriting, which impacts her work.  *Id*.  She explained that her job duties include working on the computer, writing, and answering phones.  *Id*.  She reported that her work restrictions include limited phone time. *Id*.  She also reported that she currently drives, and that enjoys crocheting and downhill skiing.  *Id*.

After providing her health history, Plaintiff completed the Nine-Hole Peg Test[6] to assess her fine motor coordination.  Tr. 355.  The OT noted that both of Plaintiff's hands demonstrate poor coordination significantly below the mean for Plaintiff's age group.  *Id*. Plaintiff scored in the 25th percentile on the right Nine-Hole Peg Test and below the 10th percentile on the left Nine-Hole Peg Test.  Tr. 356.  Plaintiff also completed grip and pinch testing to assess her hand strength.  Tr. 355.  Her scores were significantly below the mean for her age group.  *Id*.  The OT recommended that Plaintiff complete eight sessions of occupational therapy services to address these issues.  Tr. 355, 358.

Plaintiff started attending occupational therapy every few weeks.  *See, e.g.,* Tr. 334, 340, 344, 352.  The OT worked with Plaintiff on tasks to strengthen her hand and improve handwriting, including utilizing adapted paper and performing hand strengthening exercises.  *See* Tr. 341, 352.  After a few visits, Plaintiff reported that "[w]ork is improving,

---

[6] The Nine-Hole Peg Test "is a standardized, quantitative assessment used to measure finger dexterity."  Using one hand at a time, the participant takes pegs from a container, one by one, and places them into holes on the board as quickly as possible.  The participant then removes the pegs and replaces them back into the container.  Scores are based on the time taken to complete the activity.  *Nine-Hole Peg Test*, Shirley Ryan Ability Lab, https://www.sralab.org/rehabilitation-measures/nine-hole-peg-test (last accessed July 28, 2022).

hand writing is improving, cursive writing is mixed in legibility, brain stim[ulation] levels ha[ve] not improved."  Tr. 344.  Plaintiff was also completing the "home program," utilizing tools learned during occupational therapy at home between sessions.  *See, e.g.,* Tr. 335, 337, 344.

During each occupational therapy session, the OT noted that Plaintiff was "progressing towards goals."  *See, e.g.,* Tr. 335, 337, 343, 346-47, 354.  During the third session, for example, the OT reported that Plaintiff was showing some progress in the area of handwriting.  Tr. 344.  During the fourth session, the OT reported that Plaintiff was demonstrating improvements in hand function, strength, coordination, and handwriting.  Tr. 341-43.  The OT also reported that Plaintiff "is demonstrating possible changes in balance and gait," but Plaintiff "denie[d] any changes."  Tr. 341.

During the fifth session, the OT noted that Plaintiff had only attended four out of eight sessions in the past three months due to significant family difficulties including the death of her husband.  Tr. 335.  Plaintiff was able to get back into the routine of regularly attending occupational therapy sessions, so the OT recommended that her care plan be extended.  *Id.*  The OT noted that Plaintiff was showing "good gains" in therapy and that Plaintiff reported having increased success with her daily living.  *Id.*  According to Plaintiff, however, she was experiencing decreased endurance for tasks that require moderate upper extremity strength.  *Id.*  The OT noted that Plaintiff's gait has changed, she is beginning to shuffle as is common with Parkinson's disease, and she has become less steady during standing activities.  *Id.*  The OT recommended that Plaintiff pursue physical therapy to address these issues.  *Id.*  The OT noted that Plaintiff was progressing toward each of her

goals, is regularly using adapted paper to improve overall handwriting with good success, and that she completed muscle testing with good strength albeit poor endurance.  Tr. 337.

Plaintiff continued attending occupational therapy every couple weeks.  *See, e.g.,* Tr. 303, 312, 326.  Plaintiff reported consistent change in function each week, improved handwriting, and increased strength.  Tr. 312, 327.  She stated that she is feeling better about her handwriting and is noticing that she can read her handwriting better than she could when she started occupational therapy.  Tr. 312.  The OT continued to note that Plaintiff was progressing toward her goals.  Tr. 304, 306-07, 312-15, 329.  By her eighth visit, the OT reported that Plaintiff was making progress overall, but was beginning to slow down with progress.  Tr. 304.  The OT noted, however, that Plaintiff was nearing average scores for her age group on standardized testing.  *Id*.  The OT observed that Plaintiff was progressing towards her goals of demonstrating: (1) improved handwriting legibility to be 90% legible to complete job duties; (2) improved hand strength to improve coordination and strength to complete daily living tasks; (3) improved dexterity in order to complete daily tasks at work and at home; and (4) improved arm strength and endurance in order to complete household management tasks.  Tr. 306-07.

### 3.  Speech Therapy Appointments

Plaintiff also saw a speech language pathologist ("SLP") in 2018 for concerns with voice and speech rate.  Tr. 359-60.  Plaintiff specifically noted concern with her voice being quiet and her speech rate being much faster than normal, which, according to Plaintiff, impacts her intelligibility and limits her ability to complete her job and socialize with family and friends effectively.  Tr. 360.  The SLP observed that Plaintiff demonstrated

deficits with volume, pitch, breath support, and rate. *Id*. The SLP evaluated Plaintiff's speech impairment as "mild," her quality of voice as "good," and her voice impairment as "mild." *Id*. The SLP determined that Plaintiff was an "excellent" candidate for LSVT LOUD treatment.[7] *Id*. The SLP recommended that Plaintiff complete 16 LSVT LOUD voice treatment sessions, attending four sessions, four times per week. Tr. 363.

Plaintiff attended her speech therapy appointments in February, March, May, and June 2018, completing 15/16 appointments. *See* Tr. 296, 299, 301, 307, 309, 315, 317, 319, 321, 324, 330, 332, 338, 349, 359. She also did the "home program," completing speech practice and homework. *See, e.g.,* Tr. 307, 317, 322, 324, 330, 332. During her speech therapy appointments, Plaintiff completed clinician-facilitated tasks to address her voice and speech-related concerns using the LSVT LOUD program. *See, e.g.,* Tr. 317, 22, 324, 330, 332, 338, 349. The SLP noted during each session that Plaintiff was either progressing towards her goals or had met certain goals. *See, e.g.,* Tr. 297-98, 300, 302-03, 308-09, 311, 316, 318, 323, 325, 331, 333, 339, 350. Plaintiff also reported feeling like she was making progress, for example, noting that she went to a family barbeque and people did not need to ask her to repeat herself as much as usual, Tr. 315, and that her voice sounded "pretty good" in a phone message she left for her SLP, Tr. 297.

In October 2018, Plaintiff was discharged from speech therapy. Tr. 298. The SLP noted that therapy was not completed as Plaintiff did not return after her June 8, 2018,

---

[7] "LSVT LOUD is an effective speech treatment for people with Parkinson's . . . [that] trains people with [Parkinson's disease] to use their voice at a more normal loudness level while speaking at home, work, or in the community." *LSVT LOUD: Speech Therapy for Parkinson's Disease and Similar Conditions*, LSVT Global, https://www.lsvtglobal.com/LSVTLOUD (last accessed July 28, 2022).

appointment. Tr. 298-99. The SLP determined that Plaintiff met 90% of her goals but the current status of Plaintiff's goals cannot be assessed due to Plaintiff not returning. *Id.*

### C.    2019

In January 2019, Plaintiff was referred to Dr. A. Neil Johnson for a medical evaluation. Tr. 442. Dr. Johnson observed that the "[r]ange of motion of [Plaintiff's] joints was normal," her "joints are free of tenderness, erythema, and effusion," she "can button a button and pick up a coin," and that "[s]he has full motion of her fingers." Tr. 443. Additionally, he noted that Plaintiff's motor strength was 5/5, her grips measured out pretty good, her sensation was intact, and her reflexes were symmetrical. Tr. 444. Dr. Johnson explained that Plaintiff's handwriting was not very good, that it gets very small and hard to read, and that Plaintiff seems to struggle writing with her right hand. Tr. 443-44. Dr. Johnson further observed that Plaintiff walked normally without the use of an assistive device, had no difficulty getting on or off the examination table or tandem walking, and had mild difficulty squatting." Tr. 443. As far as Plaintiff's speech, Dr. Johnson described a "mild clarity of speech difficulty," specifically, that Plaintiff "does have some effect on her speech. The clarity is mildly impaired and the amplitude of speech is somewhat decreased." Tr. 443-44.

In February, Plaintiff saw Eleanor Orehek, MD, for an initial appointment at Noran Neurological Clinic. Tr. 453. Dr. Orehek noted that since Plaintiff's DBS surgery in 2017, she has had marked improvement in motor symptoms, much less dyskinesia, no episodes of freezing, but has ongoing issues with speech and handwriting. *Id.* Plaintiff reported that she worked with an OT to try to improve her handwriting, which made some improvement,

but not a significant one. *Id.* Plaintiff also reported doing the LSVT LOUD speech therapy, which she felt was partly beneficial. *Id.* Plaintiff stated that she felt like she has had a dramatic improvement in the quality of her life, but reported that she had to stop working in November 2018 when it got too challenging to work. *Id.*

Dr. Orehek observed that Plaintiff "is seemingly doing well after her DBS surgery." Tr. 454. Dr. Orehek noted that Plaintiff's motor power was "strong and symmetrical," and that she had no tremor, slight-to-mild dyskinesias, was able to stand from sit without significant difficulty, and her gait was narrow-based and fairly steady-appearing. *Id.* Dr. Orehek also observed that Plaintiff's language was "fluent," and she had "mild-to-moderate dysarthria with festinating quality of speech." *Id.* Dr. Orehek noted that Plaintiff's "biggest problems are her ongoing speech issues, handwriting difficulties, and some difficulty with sleep." *Id.* Dr. Orehek made some adjustments to Plaintiff's medication and recommended that Plaintiff exercise more regularly and return for a visit in 2-3 months. Tr. 455.

In April, Plaintiff filled out a disability report. Tr. 255-63. She reported that since the date of her last disability report, January 2019, there had not been a change, for better or worse, in her physical or mental condition. Tr. 256. Plaintiff filled out another disability report in May. Tr. 268-75. She again reported that there had not been a change in her condition since her last report. Tr. 269.

**D. 2020**

Plaintiff saw Dr. Orehek again for a follow-up visit in March 2020. Tr. 501. Plaintiff reported that the medication adjustments have helped her mood and helped her

sleep much better. *Id.* Plaintiff, however, reported some drooling and ongoing speech difficulty. *Id.* Specifically, Plaintiff reported having trouble with word finding and losing her train of thought. *Id.* Dr. Orehek noted that Plaintiff only had one fall since her last visit and was not injured, and that she is generally feeling like her balance is okay. *Id.* Otherwise, Plaintiff had "[n]o other significant changes since [her] last visit" in February 2019. *Id.*

Dr. Orehek observed that Plaintiff "continues to have on/off fluctuations that make function very unpredictable and would be one of the biggest factors in maintaining gainful employment since hour to hour and day to day, she could have significantly [sic] fluctuations and difficulty without predictability." Tr. 502. Dr. Orehek noted that the DBS is helping to some extent, but that Plaintiff still has to take one tablet every three hours. *Id.* Dr. Orehek suggested that Plaintiff increase her cardio, consider another speech therapy program, continue her medication regimen, and return for a follow-up visit in four months. Tr. 501-02.

Plaintiff also saw psychologist Janaka Hanvey, Ph.D., in 2020. Tr. 507-16. The psychologist noted that Plaintiff's reported depressive symptoms included crying spells, concentration difficulties, sadness, isolation, increased worrying, and decreased sociability. Tr. 510. Plaintiff was diagnosed with dysthymic disorder and weekly individual therapy was recommended. Tr. 510-11. During her therapy sessions, Plaintiff discussed topics such as grieving her husband's death and father's death, experiencing pain, needing to see her neurologist, spending time with her daughter, playing board games with her mother, going for daily walks with her mother's dog, working on a 1000-pieec

puzzle, and feeling couped up given Covid-19-related restrictions. *See* Tr. 512-16. In April 2020, Plaintiff reported that her depression is manageable most days. Tr. 515. She also reported that the damp weather affects her rheumatoid arthritis a lot. Tr. 516. Plaintiff also shared that "[s]he is frustrated by her health and how as a result she is unable to work." Tr. 514. She reported feeling "physically debilitated" since her surgery in 2017. *Id*.

## IV. OPINION EVIDENCE

### A.    Dr. Johnson

In January 2019, Plaintiff saw Dr. A. Neil Johnson for a medical evaluation, discussed *supra* in Section III.C. Tr. 442. To briefly summarize, Dr. Johnson observed that the "[r]ange of motion of [Plaintiff's] joints was normal," her "joints are free of tenderness, erythema, and effusion," and that "[s]he has full motion of her fingers." Tr. 443. Additionally, he noted that Plaintiff's motor strength was 5/5, her grips measured out pretty good, her sensation was intact, and her reflexes were symmetrical. Tr. 444. Dr. Johnson also observed that Plaintiff has a "mild clarity of speech difficulty" and the "amplitude of speech is somewhat decreased." Tr. 443-44.

### B.    Dr. Orehek

In February 2019, and later in March 2020, Plaintiff saw Dr. Orehek at Noran Neurological Clinic, discussed *supra* in Sections III.C and III.D. Again, to briefly summarize, Dr. Orehek noted that Plaintiff's motor power was "strong and symmetrical," and that she had no tremor, slight-to-mild dyskinesias, was able to stand from sit without significant difficulty, and her gait was narrow-based and fairly steady-appearing. Tr. 454. Dr. Orehek also observed that Plaintiff's language was "fluent," and she had "mild-to-

moderate dysarthria with festinating quality of speech." *Id*.  In 2020, Dr. Orehek observed that Plaintiff "continues to have on/off fluctuations that make function very unpredictable and would be one of the biggest factors in maintaining gainful employment since hour to hour and day to day, she could have significantly [sic] fluctuations and difficulty without predictability."  Tr. 502.

### C.    State Agency Medical Consultants

In February and April 2019, two state agency medical consultants assessed Plaintiff's residual functional capacity.  Tr. 72-77, 87-92.  They opined that Plaintiff had exertional limitations.  Tr. 72, 87.  Specifically, Plaintiff was limited to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds.  Tr. 73, 87. Additionally, Plaintiff could only sit, stand, or walk for about 6 hours in an 8-hour workday. *Id*.  They also opined that Plaintiff had postural limitations, including occasionally climbing ramps/stairs, climbing ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling. Tr. 73, 87-88.  They further opined that Plaintiff had manipulative limitations, including limited handling (gross manipulation) and fingering (fine manipulation).  Tr. 73, 88.  The state agency medical consultants also opined that Plaintiff had communicative limitations, including a severe speech impairment, and environmental limitations, including avoiding concentrated exposure to wetness, noise, vibration, and hazards like machinery and heights.  Tr. 74, 88-89.

One of the state agency medical consultants, Dr. Mark Ruiz, noted that Plaintiff presented with normal gait, was able to get on and off the exam table without difficulty, had no difficulty with tandem gait, had mild difficulty squatting, was able to button and

16

pick up a coin, and had 5/5 motor strength. Tr. 75. Both state agency medical consultants, Dr. Mark Ruiz and Dr. Gregory Salmi, noted that Plaintiff's speech impairment is severe. Tr. 75, 90. They opined that Plaintiff's speech impairment "would pose some work-related limitations." *Id*. Specifically, Plaintiff would "frequently be able to communicate with the general public but may require extra time to communicate due to the need to repeat herself at times to be understood." *Id*. The doctors opined that Plaintiff "would do best in a setting with no need for excessive/prolonged verbal communication," and "with face-to-face communication with limited need for phone communication with the general public." *Id*. The state agency medical consultants opined that Plaintiff could perform light work. Tr. 76, 91.

## V. HEARING TESTIMONY

At the hearing on April 27, 2020, Plaintiff testified that she is 51 years old, and her highest level of education is one year of vocational college. Tr. 38, 44. She testified that she worked previously as an office manager and insurance sales agent, but she is no longer able to work. Tr. 44, 55-56.

Plaintiff testified that her DBS surgery in 2017 has helped with her tremors, but she still has problems handwriting with her right hand, and has trouble opening things, lifting things, getting dressed, and doing other daily tasks when she has "an off day where [her] med[ication]s are not working." Tr. 45. Plaintiff stated that she notices that she drags her feet along the ground as she walks. Tr. 49. Plaintiff testified that she also has problems with her balance. Tr. 46. She testified that she sometimes loses her balance when she is walking and wants to stop and turn around. *Id*. She said that about once a week, sometimes

two or three times a week, she loses her balance and has to catch herself from falling. Tr. 46-47. She stated that this has been going on since she was first diagnosed with Parkinson's disease in 2007. Tr. 52. She contended that she did not report these as "falls" to her doctors since she "didn't fall all the way down." *Id*. Plaintiff reported that on one occasion in February 2020, she was not able to catch herself and fell down to the ground. Tr. 53. She testified that when she was in the kitchen getting something to eat and went to turn around, she lost her balance and fell to the floor. Tr. 46. This was the first time that Plaintiff was not able to catch herself from falling and actually fell completely down to the ground. Tr. 53. Further, Plaintiff testified that she has trouble sleeping. Tr. 48. She stated that she was prescribed a sleep medication which makes her feel a bit fatigued and drowsy but helps her sleep all night. Tr. 48-49.

Plaintiff reported that changes in the weather and certain upcoming events can trigger fatigue, anxiety, or other symptoms of Parkinson's disease. Tr. 50. For example, Plaintiff testified that she was "full of anxiety" the morning she testified at her hearing. *Id*. She testified that she started receiving psychiatric treatment ("talk therapy") which has helped her, and she reported that she does not take medications for anxiety. Tr. 51. She also testified that there are days she gets depressed about her Parkinson's disease because she is not able to do things she used to be able to do. *Id*.

Plaintiff testified that she worked for about a year after her DBS surgery but ultimately had to leave her job. Tr. 47. She testified that she had difficulty performing her job duties after her surgery. Tr. 47-48. She stated that her job was high stress and required her to be on the phone, complete various reports, and change customers' policies, and she

became anxious trying to complete her tasks in a timely manner. Tr. 47. Her employer took away some of her job responsibilities, such as talking to customers on the phone and some of her daily reports, in order to make her job easier for her. Tr. 48. She testified that she wanted to continue to work but struggled during her last few months. Tr. 47. She testified that she "held on as long as [she] could, and then one day [she] finally said, [she] couldn't take it no more." *Id.* Plaintiff testified that she believes she could be a risk at work if she had a job because she could be "off balance" and "fall and get hurt at work." Tr. 52.

Plaintiff testified that she lives with her mother. Tr. 49. She reported that she has a driver's license and generally drives about three times a week to places like Walmart or the grocery store. Tr. 49-50. She testified that she only drives locally, avoiding the Twin Cities because of the stress of driving there. Tr. 50. Plaintiff testified that on a typical day, she goes for walks around her home association complex and takes her mother's dog for a walk down the block. Tr. 50, 53. She reported that she does not use an assisted device to walk, but she walks slowly so she does not fall. Tr. 53-54. She testified that she makes her own meals, such as spaghetti, chili, baked chicken, and sandwiches, and cleans her room and bathroom. Tr. 54. She reported that she "take[s] [her] time" and does not "make it a race." *Id.* She testified that she was currently working on completing a thousand-piece puzzle and that she crochets, although she is slower in doing that than she used to be. Tr. 51.

Vocational expert Paul Delmar also testified at the hearing. Tr. 54-63. He testified that he has been a vocational rehabilitation counselor since 1976 and has worked primarily

with the industrially injured population with both cognitive deficits and physical limitations. Tr. 58. Delmar testified that he has gone into various manufacturing facilities and written very specific and/or detailed job descriptions to submit to treating physicians for their approval or rejection of appropriateness of employment. Tr. 58-59. According to Delmar, that has allowed him to acquire a knowledge of physical limitations in various performance of occupations or professions. Tr. 59.

He testified that a hypothetical individual with Plaintiff's education, experience, and limitations could not perform Plaintiff's past work like insurance sales and office management, but could perform light, unskilled manufacturing work like assembly, inspector, or bench assembly. Tr. 57-58. When the ALJ added a limitation that the individual would not use frequent bilateral handling and fingering, and instead frequent handling and fingering on just the left and occasional with the right, Delmar testified that would significantly reduce the employment situation. Tr. 59. Delmar testified that adding the limitation of occasional bilateral use of the upper extremities, a hypothetical individual could perform light work such as inspector, machine tender, or bottle line attendant. Tr. 60. When asked about being off task, Delmar testified that employers generally accept 10% decreasing productivity. Tr. 62. When that decreasing productivity hits the 15-20% range, the employee will generally "get a talking to." *Id*. If they continue to function at a reduced rate, they will not maintain employment. *Id*. As far as absences or tardiness related to symptoms, Delmar testified that employers generally tolerate 1-2 absences or tardies. Tr. 62-63. If it is more than that, that will "certainly result in termination." Tr. 63.

# VI. ALJ'S DECISION

The ALJ found that Plaintiff had the following severe impairments: Parkinson's disease; status post deep brain stimulator; speech impairment; and rheumatoid arthritis. Tr. 21. The ALJ further concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1. Tr. 24-25.

The ALJ found that Plaintiff had the residual functional capacity to perform light work[8] with additional limitations as follows:

> [O]ccasional climbing of ramps and stairs; occasional climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling[,] crouching, and crawling; no balancing in the context of being at heights or perhaps needing to walk along a narrow plank; frequent bilateral handling and fingering; an indoor environment so as to avoid slick surfaces, unprotected heights, vibrations to the body, and hazardous machinery; work tasks that would not involve direct serving of the public; and that would involve occasional contact with coworkers, however, the tasks are those that can primarily be performed independently without collaboration or teamwork necessarily with coworkers.

Tr. 25.

In reaching this residual functional capacity, the ALJ conducted an analysis of the medical opinion evidence provided in the case. *See supra* Section IV. The ALJ noted that

---

[8] As set forth in the regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

she would "not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from [Plaintiff's] medical sources." Tr. 28. *See* 20 C.F.R. §§ 404.1520c ("For claims filed on or after March 27, 2017, the rules in this section apply."), .1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [Plaintiff's] medical sources.").

Based on Plaintiff's age, education, work experience, residual functional capacity, and the testimony of the vocational expert, the ALJ found that Plaintiff was capable of performing the representative light, unskilled occupations such as assembler, inspector, or bench assembler. Tr. 31. Accordingly, the ALJ concluded that Plaintiff was not under disability. Tr. 31-32.

## VII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidence is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (per curium) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). The ALJ's decision "will not [be] reverse[d] simply because some

evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past

23

relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a). Once the claimant demonstrates that she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. § 404.1546(c). "An ALJ determines a claimant's [residual functional capacity] based on

all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 2022 WL 696974, at *5 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. § 404.1546(c).

Plaintiff argues that the ALJ erred in her residual-functional-capacity determination because the residual functional capacity is not supported by substantial evidence in the record. Pl.'s Mem. in Supp. at 10, ECF No. 25. Specifically, Plaintiff argues that (1) the residual functional capacity did not incorporate Plaintiff's limitations in the use of hands or with endurance, which is supported by objective medical test results; (2) the ALJ analyzed Plaintiff's subjective complaints improperly; and (3) because the residual functional capacity was inaccurate, the testimony from the vocational expert based upon the residual functional capacity cannot constitute substantial evidence to support the ALJ's determination. *See id.* at 11-17.

## A.    Limitations Included in the Residual Functional Capacity

Plaintiff argues that the ALJ failed to incorporate appropriate limitations in the use of hands or with endurance in determining her residual functional capacity. *Id*. at 11-13. Plaintiff contends that objective test results demonstrate "severely diminished capacity to use [Plaintiff's] hands and fingers to perform the job-related functions of feeling, handling, and fingering bilaterally." *Id*. at 11. For example, Plaintiff notes that medical records show that she had poor speed, coordination, and endurance, scored below the 10th percentile on the Nine-Hole Peg Test, and "expressed difficulty doing something as simple as writing a to-do list." *Id*. at 11-13. Plaintiff argues that the residual functional capacity determination was incorrect because "[s]ubstantial evidence of this record and common sense would suggest that someone functioning within the 25th percentile or less for fine motor coordination bilaterally, who also struggles with endurance and speed in performing fine motor tasks, could not 'frequently' use their hands and fingers for more than half of each day, every day, during a workweek." *Id*. at 13. This Court disagrees.

The ALJ repeatedly pointed to places in the record showing that Plaintiff did not require "a limitation beyond frequent handling and fingering with her hands." *See* Tr. 28. For example, the ALJ noted that Plaintiff's consultative examination with Dr. Johnson in January 2019 demonstrated that:

> [Plaintiff's] range of motion exam of the joints was normal and all joints were free of tenderness, erythema, and effusion. [Plaintiff's] handwriting was small and hard to read. She was able to pick up a coin and fasten a button. Her pinch and grip were reasonably good, strength was 5/5, and she had some crepitus of the knees. [Plaintiff] did not use an assistive device and walked normally. [Plaintiff] had no nodules and no

26

> significant deformities. She had full motion of her fingers[.]
> Reflexes were symmetrical, sensation was intact, and there was
> not any localizing weakness.

Tr. 27 (citing Exhibit 3F, Tr. 441-48). The ALJ also cited multiple places in the record where Plaintiff engaged in a wide variety of activities requiring the use of her hands, including walking a dog, doing puzzles, driving, going to the grocery store, and making meals. Tr. 28. Further, the manipulative limitations included by the ALJ were consistent with the opinions of the state agency medical consultants. *See id*; *accord* Tr. 73-74, 88.

While Plaintiff is correct that the "[o]bjective test results" show that she scored below the 10th percentile on the left Nine-Hole Peg Test and significantly below the mean for her age group on other tests, the Court notes that those results are from March 2018, *before* Plaintiff participated in occupational therapy. *See* Tr. 355-56. The medical records demonstrate that Plaintiff showed improvement after March 2018. During her fourth occupational therapy session, for example, the OT reported that Plaintiff was demonstrating improvements in hand function, strength, coordination, and handwriting. Tr. 341-43. By her eighth visit, the OT reported that Plaintiff was nearing average scores for her age group on standardized testing. Tr. 304. In February 2019, Dr. Orehek noted that Plaintiff has had "marked improvement" in her motor symptoms, much less dyskinesia, and no episodes in freezing. Tr. 453. Dr. Orehek also noted that Plaintiff's motor power was "strong and symmetrical," and that she had no tremor, slight-to-mild dyskinesias, was able to stand from sit without significant difficulty, and her gait was narrow-based and fairly steady-appearing. Tr. 454; *accord* Tr. 27. In March 2020, Dr. Orehek noted that Plaintiff complained about difficulty with mood and sleep but otherwise

had "[n]o other significant changes since [her] last visit" in February 2019.  Tr. 501; *accord*

Tr. 27.  Thus, the record supports the ALJ's determination that Plaintiff did not require "a

limitation beyond frequent handling and fingering with her hands."  *See* Tr. 28.

In sum, the Court finds that the ALJ's thorough discussion of the relevant medical

evidence demonstrates that Plaintiff's limitations in the use of hands or with endurance was

considered in determining her residual functional capacity.  Plaintiff has not met her burden

to show that she has greater functional limitations in the use of her hands or with her

endurance than the limitations determined by the ALJ.  *See Perks*, 687 F.3d at 1092

(quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)  ("[T]he burden of

persuasion to prove disability and demonstrate [residual functional capacity] remains on

the claimant")).

Further, the Court finds that the ALJ's residual functional capacity determination as

a whole is supported by substantial evidence in the record.  The ALJ considered all of the

relevant evidence in determining that Plaintiff had the residual functional capacity to

perform light work with "frequent bilateral handling and fingering," "work tasks that would

not involve direct serving of the public," and "that would involve occasional contact with

coworkers," among other limitations.  *See* Tr. 25.

First, the ALJ summarized the medical records, noting that "the objective exams of

[Plaintiff's] hands or observations by providers do not support a limitation beyond frequent

handling and fingering with her hands."  Tr. 28.  The ALJ noted that an examination in

February 2018 demonstrated "improved gait, . . . relatively normal left body findings, but

some mild Parkinsonism on the right side."  Tr. 27.  Despite the mild Parkinsonism on

Plaintiff's right side, Plaintiff's "functioning [was] almost entirely within normal limits," her range of motion of the joints was normal, her pinch and grip were reasonably good, and her strength was 5/5. *Id.* Further, the ALJ cited Dr. Johnson's examination that Plaintiff had "full motion of her fingers[,] [her r]eflexes were symmetrical, sensation was intact, and there was not any localizing weakness." *Id.* With respect to Plaintiff's speech, the ALJ pointed to medical evidence that Plaintiff "had mild clarity of speech difficulty and that amplitude of speech was mild to moderately decreased." *Id.*

The ALJ explained that "[b]ased on her Parkinson's disease and rheumatoid arthritis, the light exertional range with the cited postural limitations as well as frequent bilateral handling and fingering as well as an indoor environment as stated account for her overall objective findings, examinations, observations by providers and course of and response to treatment as well as her overall functioning." Tr. 28. Further, the ALJ found that "[b]ased on objective evidence related to her speech, interaction with coworkers and the public is limited to no direct serving the public and occasional contact with coworkers but the tasks primarily are performed independently without collaboration or teamwork with coworkers." Tr. 28.

Additionally, the ALJ properly looked beyond the medical evidence, considering, among other things, Plaintiff's testimony at the hearing, including the symptoms she experiences, as well as her daily activities. Tr. 26, 28-29. The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 26. The ALJ noted, for example, that while Plaintiff testified to falling once a week, she

later clarified that she had only recently begun to fall and previously was able to catch herself without falling. Tr. 29. The ALJ also noted that Plaintiff "engages in a range of daily activities," such as walking a dog, doing puzzles, watching movies with her mother, driving a few times a week, going to the grocery store, running errands, and making meals. Tr. 28.

The ALJ also properly considered the opinion evidence. In addition to evaluating the examinations and records from Drs. Orehek and Johnson, the ALJ considered the opinions of the state agency medical consultants. *See* 20 C.F.R. § 404.1513a(b)(1) (ALJ required to consider opinions of state agency medical consultants as such "consultants are highly qualified and experts in Social Security disability evaluation"). The ALJ found the state agency medical consultants' opinions "persuasive because they are consistent with the record, as supported by the neurological office visits, observations at other visits, and [Plaintiff's] functioning during the period at issue." Tr. 28-29. Regarding the limitation to exposure to noise, however, the ALJ found that the state agency medical consultants did not state the limitation functionally and the basis for the limitation is unclear. Tr. 29. The ALJ further found that the speech-related limitations for phone work and communicating were not stated in functional vocationally relevant terms. *Id*. Nonetheless, the ALJ found that the limitations of the residual functional capacity addressed the state agency medical consultants' opinions. *Id*. The ALJ did not credit Dr. Orehek's assessment because it was "not consistent with the overall record," and found that Dr. Johnson's assessment was not an opinion of work-related functioning and therefore need not be addressed in terms of persuasiveness. Tr. 29. The Court finds that the ALJ gave good reasons for finding the

state agency medical consultants' opinions persuasive and for declining to do so for Drs. Orehek and Johnson. Thus, the Court concludes that the ALJ's residual-functional-capacity determination is supported by substantial evidence in the record as a whole.

### B.    Analysis of Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ erred by discounting Plaintiff's subjective complaints in her residual functional capacity determination. Pl.'s Mem. in Supp. at 14-17. When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL

1119029, at *7.  The ALJ is not required to discuss each factor individually or in depth.

*See Dunahoo v. Apfel*, 214 F.3d 1033, 1038 (8th Cir. 2001).  "Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin*, 826 F.3d at 1086 (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

At the hearing, Plaintiff testified that she left her job because it "required [her] to be on the phone and do various reports and change customers' policies. And that would create anxiety in trying to get it done in a timely matter . . . [a]nd because of [her] anxiety, it just made it harder to work . . . ."  Tr. 44.  She testified that her DBS surgery has "helped [her] with the tremors," but she still has problems with handwriting with her right hand, opening things, lifting things, getting dressed, and doing other daily tasks when she has "an off day where [her] med[ication]s are not working."  Tr. 45.  Plaintiff also testified that she has problems with her balance and has had "falls about once a week" since she was diagnosed with Parkinson's disease in 2007.  Tr. 52.  Plaintiff clarified that those falls were not generally falls to the ground, instead, she would lose her balance and catch herself from falling.  Tr. 46-47, 52-53.

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Tr. 26.  As noted

above, Plaintiff asserts that the ALJ erred by discrediting Plaintiff's description of her symptoms and limitations, as it is a "commonly held understanding that Parkinson's symptoms and its impact will change from day to day." Pl.'s Mem. in Supp. at 16. Specifically, Plaintiff argues that the fact that she can sometimes perform tasks like simple meal preparation and cleaning does not support a finding that she can perform full-time competitive work. *Id*. at 17.

In assessing Plaintiff's subjective symptoms, the ALJ correctly pointed out that there was objective medical evidence in the record that did not substantiate the intensity, persistence, and limiting effects of Plaintiff's symptoms to the degree alleged. For example, the ALJ discussed that, despite Plaintiff's claim that of catching herself from falling or falling once a week, "the record . . . did not reflect falls as an issue since receiving the deep brain stimulator." Tr. 29. Instead, the ALJ cited evidence from the record that Plaintiff "walked normally," had "improved gait," "was able to pick up a coin," and had the "ability to stand from sitting." Tr. 27. Further, the ALJ cited objective medical evidence that Plaintiff did not deal with hand limitations to the extent that she described. For example, the ALJ cited Dr. Johnson's consultative examination, where he observed that:

> [Plaintiff's] range of motion exam of the joints was normal and all joints were free of tenderness, erythema, and effusion. [Plaintiff's] handwriting was small and hard to read. She was able to pick up a coin and fasten a button. Her pinch and grip were reasonably good, strength was 5/5, and she had some crepitus of the knees. [Plaintiff] did not use an assistive device and walked normally. [Plaintiff] had no nodules and no significant deformities. She had full motion of her fingers[.]

33

> Reflexes were symmetrical, sensation was intact, and there was
> not any localizing weakness.

Tr. 27.  Further, the ALJ rejected Plaintiff's allegation of illegible handwriting after

assessing her handwriting, noting that she reviewed Plaintiff's handwriting and it is "not

illegible."  Tr. 28.  The ALJ also observed that "[t]here are no objecting findings for the

hands that support illegible hand writing."  *Id.*  Thus, the ALJ conducted a proper

assessment of Plaintiff's symptoms because her assessment was supported by substantial

evidence.

In addition to the objective medical evidence that supports the ALJ's decision to

discount Plaintiff's statements about the limiting effects of her symptoms, the Court finds

that the ALJ also properly considered the appropriate factors based on evidence in the

record as a whole in discounting Plaintiff's subjective symptoms.  *See* 20 C.F.R. §

404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4 ("We must consider whether an

individual's statements about the intensity, persistence, and limiting effects of his or her

symptoms are consistent with the medical signs and laboratory findings of record.").  In

making her determination, it appears the ALJ carefully considered factors such as

Plaintiff's daily activities, the duration, frequency, and intensity of Plaintiff's symptoms,

precipitating and aggravating factors, the dosage, effectiveness, and side effects of

medication, and Plaintiff's functional restrictions.  *See* 20 C.F.R. § 404.1529(c)(3); SSR

16-3p, 2016 WL 1119029, at *7; *see also Vance*, 860 F.3d at 1120.  For example, the ALJ

reasonably found Plaintiff's reported daily activities "inconsistent" with her subjective

complaints.  Tr. 26, 28.  She "reported that she could handle her own finances and did

shopping in stores and by computer for household items and gifts." Tr. 22. She stated that she drives a few times per week, goes to the grocery store, and does other local errands. Tr. 22-23, 28. She also reported caring for a cat, walking her mother's dog, and doing puzzles. Tr. 23, 28. She also stated that she could do "most indoor chores," such as making meals like sandwiches, spaghetti, chili, and baked chicken. Tr. 22-23, 28. While Plaintiff "need not prove she is bedridden or completely helpless to be found disabled," *see Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted), her daily activities can nonetheless be seen as inconsistent with her subjective complaints and may be considered alongside other factors in assessing the severity of her subjective complaints of pain. *See Vance*, 860 F.3d at 1121 (finding "[t]he inconsistency between [the claimant's] subjective complaints and evidence regarding her activities of daily living" raised questions about the weight to give to her subjective complaints). Thus, the ALJ properly discredited Plaintiff's allegations of her physical symptoms and limitations as they were inconsistent with evidence of daily activities. *See, e.g., Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain.").

In sum, the ALJ provided good reasons to support the conclusion that Plaintiff's symptoms were not as intense, persistent, and limiting as alleged. Therefore, the Court concludes that the ALJ did not err in assessing the intensity, persistence, and limiting effects of Plaintiff's subjective complaints.

### C.    Reliance on Vocational Expert

Lastly, Plaintiff asserts that the testimony of the vocational expert does not constitute substantial evidence on which to base a denial of her claim for benefits because the ALJ's determination of her residual functional capacity was inaccurate.  Pl.'s Mem. in Supp. at 13.  Plaintiff's argument is based on her contention that the ALJ erred by not including appropriate limitations in the use of Plaintiff's hands or with endurance.  As discussed above, however, the Court finds that the ALJ did not err in her residual-functional-capacity determination.  Further, "an ALJ must include 'only those impairments and limitations [s]he found to be supported by the evidence as a whole in h[er] hypothetical to the vocational expert.'" *Nash v. Commissioner, Social Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011)).  An ALJ is "not required to include other limitations in the hypothetical that [s]he found to be unsupported in the record."  *Perkins*, 648 F.3d at 902.  Because the ALJ found that "the objective exams of [Plaintiff's] hands or observations by providers do not support a limitation beyond frequent handling and fingering with her hands," the ALJ was not required to include additional limitations in the hypothetical posed to the vocational expert.

*[Continued on next page.]*

## VIII. RECOMMENDATION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 24, be **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 26, be **GRANTED.**

Date: July _____28_____, 2022                    _____*s/ Tony N. Leung*_____
                                                 Tony N. Leung
                                                 United States Magistrate Judge
                                                 District of Minnesota

                                                 *Colette C. C. v. Kijakazi*
                                                 Case No. 20-cv-2282 (NEB/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).